IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRANDON EVANS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14 C 1088 |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | Magistrate Judge Finnegan |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Brandon Evans applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416, 423(d), 1381a. An Administrative Law Judge awarded him a closed period of benefits from May 7, 2010 through July 20, 2011, but found that he thereafter experienced medical improvement related to his ability to work and was no longer disabled. In this lawsuit, Plaintiff seeks judicial review of that decision, which stands as the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant"). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and have now filed cross-motions for summary judgment. After careful review of the record, the Court grants Defendant's motion, denies Plaintiff's motion, and affirms the decision to award Plaintiff a closed period of benefits ending July 20, 2011.

## PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on February 7, 2011, alleging in both applications that he became disabled on May 7, 2010 due to lumbar spinal fusion with

instrumentation (back injury on May 7, 2010 leading to surgery on November 19, 2010), and depression. (R. 170-77, 220). The Social Security Administration denied the applications initially on May 12, 2011, and again upon reconsideration on October 5, 2011. (R. 65-106). Plaintiff filed a timely request for hearing and appeared before Administrative Law Judge Denise McDuffie Martin (the "ALJ") on August 22, 2012. (R. 39). The ALJ heard testimony from Plaintiff, who was represented by counsel, as well as from medical expert Sheldon J. Slodki, M.D. (the "ME") and vocational expert Grace Gianforte (the "VE"). Shortly thereafter, on September 28, 2012, the ALJ found that Plaintiff was disabled from May 7, 2010 through July 20, 2011, but that he subsequently experienced medical improvement enabling him to perform a significant number of sedentary jobs available in the national economy. (R. 18-33).

In support of his request for remand, Plaintiff argues that the ALJ (1) erred in finding medical improvement as of July 20, 2011; (2) made an improper credibility determination; and (3) improperly weighed the evidence from treating physician Mark A. Lorenz, M.D. As discussed below, the Court finds that the ALJ's decision is supported by substantial evidence and there is no basis for remanding the case.

## FACTUAL BACKGROUND

Plaintiff was born on February 2, 1982, and was 30 years old at the time of the ALJ's decision. (R. 170). He lives with his wife and 7-year-old daughter. (R. 42, 51). Plaintiff graduated from high school in May 2000 and completed trade school with a five-year apprenticeship as an electrician. (R. 221). He spent approximately five years as a car service technician followed by five years as an electrician, but he had to stop working on May 7, 2010 after suffering a back injury during a construction job. (*Id.*). He

was diagnosed with L5-S1 disk herniation with annular tear and axial back pain, as well as degenerative disc disease of the lumbar spine, and sought regular treatment from orthopedic surgeon Mark A. Lorenz, M.D., and pain specialist Eugene Becker, M.D. When conservative measures such as medication management and physical therapy proved unsuccessful in controlling his pain, Plaintiff decided to have an L5-S1 interbody and posterior spinal fusion, which Dr. Lorenz performed on November 19, 2010. (R. 297).

## A. Medical History

### 1. November 2010 through June 2011

On November 23, 2010, one week after the surgery, Plaintiff saw Dr. Becker to discuss his post-operative medication management. Most of Plaintiff's pain was in the lower back at that time at a level of 7/10, with very minimal pain in the legs. Dr. Becker prescribed Kadian (morphine sulfate), Lyrica and Zanaflex, which had "worked well" for Plaintiff before the surgery, and also added Norco to assist with more acute surgical pain. Dr. Becker advised Plaintiff to take amitriptyline at night to help him sleep, and told him to return for a follow-up visit in two weeks. (R. 459).

Approximately one week later, on December 1, 2010, Plaintiff saw T. Lindley Pittman, P.A.-C, a certified physician's assistant from Dr. Lorenz's office, for his first post-surgical evaluation. Plaintiff reported that his pain was at a level 6 or 7 out of 10, but he was not experiencing any leg or calf pain or swelling. A physical examination revealed that Plaintiff was healing well, and he had full motor power of 5/5 and a negative straight leg raise test. (R. 393). PA Pittman instructed Plaintiff to keep wearing a back brace, stay off work, and return in five weeks. (*Id.*). He also

recommended that Plaintiff continue going to the pain management service with a goal of weaning off Kadian. (R. 393-94).

When Plaintiff returned to Dr. Becker on December 8, 2010, he was wearing his back brace and walking with a cane, and reported back pain at a level of 8/10 with occasional shooting pains in the leg. Plaintiff was engaging in minimal activity and complained of poor sleep, and Dr. Becker said his primary goal was to "provide [Plaintiff] with as little pain as possible." (R. 462). At the same time, Dr. Becker wanted Plaintiff to begin physical therapy ("PT"), after which he planned to start decreasing Plaintiff's medication. (R. 462-63).

Dr. Lorenz examined Plaintiff on January 10, 2011 and found that he was "doing well" with stable pain at a level of 5-6/10. The incision was well healed, a straight leg raise test was negative, and Plaintiff exhibited strength of 4/5 with no focal weakness, though he was "very stiff" on forward flexion and extension. (R. 474). Dr. Lorenz diagnosed L5-S1 fusion with intermittent radiculitis and instructed Plaintiff to stop using the brace and begin PT. (*Id.*). Two days later, on January 12, 2011, Plaintiff told Dr. Becker that his pain was better (4/10) with no weakness or numbness, but he was experiencing more pain in his left leg and still having trouble sleeping. (R. 673). Dr. Becker recommended that Plaintiff continue his current medication regimen (Kadian, Norco, and Zanaflex) but decided to wean him off amitriptyline and switch him to trazodone. Dr. Becker also reiterated his plan to taper the other medications after Plaintiff had completed three weeks of PT. (*Id.*).

Plaintiff had a CT scan of the lumbar spine on January 21, 2011, which showed no signs of hardware failure. (R. 683). At a follow-up appointment with Dr. Becker on

February 7, 2011, Plaintiff reported that his pain was "getting better" and was at a level of 4/10. He was more active at home but his sleep remained poor and he was not able to tolerate trazadone due to nausea. Dr. Becker switched Plaintiff to nortriptyline for sleep and decreased his dosage of Kadian. (R. 686). The same day, Plaintiff applied for disability benefits dating back to the back injury on May 7, 2010.

The following month, on March 21, 2011, Plaintiff's pain was up slightly to a 5/10 after more than four weeks of PT. He described the pain as "stiffness" and told Dr. Becker that he could only stand and sit for one hour at a time, and could not walk for any extended period. (R. 706). With respect to his medications, Plaintiff only rarely needed to supplement the Kadian with Norco, and the nortriptyline was helping with his sleep, but he still had to use Zanaflex at night. (*Id.*). Dr. Becker instructed Plaintiff to continue his PT and medication regimen, and return in 4 to 6 weeks. (*Id.*).

On April 15, 2011, Pam Agostino, a physical therapist from City Center Physical Therapy, completed a Progress Report indicating that as a result of PT, Plaintiff had improved his endurance and was able to complete one hour of exercises, including walking on a treadmill at 2.7 mph for 15 minutes. He continued to complain of stiffness and pain in the low back, however, and Ms. Agostino stated that he "may benefit from a period of work conditioning . . . in order to be able to return to work." (R. 727).

Plaintiff next saw Dr. Lorenz for a reevaluation on April 18, 2011. He was doing better overall following PT but still had some tightness and stiffness in his back, as well as periodic spasms and occasional leg pain. On examination, Dr. Lorenz noted that Plaintiff was very stiff to flexion in the lumbar spine and had "very little extension or lateral bending." (R. 743). There was also tightness in his hip rotation and hamstrings,

though he had full strength of 5/5. Dr. Lorenz opined that Plaintiff had plateaued with the PT and should focus on his home exercise program. In response to Plaintiff's stated desire to return to work, Dr. Lorenz agreed to release him to light duty with a 15-pound lifting restriction, and referred him for a functional capacity evaluation ("FCE"). (*Id.*).

Plaintiff appeared for the FCE on April 26, 2011. According to the report submitted by Timothy Semlow, PT, a physical therapist with City Center Physical Therapy, Plaintiff demonstrated the ability to perform work at the "Light level of physical demand," including lifting a maximum of 40 pounds; occasionally squatting, stooping, kneeling, walking, and climbing ladders or stairs; and frequently standing and sitting. (R. 746). During the evaluation, Plaintiff was able to walk over one mile continuously at a speed of 2.5 mph with minimal elevation of his pain symptoms, which he rated at a level 4/10. (R. 747-48). Though he exhibited "significant restrictions on working posture and positions," he did not have any unusual pain or radicular symptoms. (R. 746-47, 749).

Also on April 26, 2011, Plaintiff had another scheduled visit with Dr. Becker. He reported that his pain was at a level 4/10, mainly in the low back radiating up to the lower thoracic spine, and that he was considering returning to work in May. Plaintiff described the pain as stiffness and confirmed that he had been using mainly Norco, along with some Kadian and Zanaflex. (R. 734). Since Plaintiff wanted to be weaned off the Kadian, Dr. Becker set up a tapering protocol and instructed him to return in 3 to 4 weeks. (R. 734, 835).

On May 10, 2011, Sumatra Mitra, M.D., performed a Residual Functional Capacity ("RFC") Assessment of Plaintiff at the request of the Bureau of Disability

Determination Services ("DDS"). (R. 70-72). Dr. Mitra found that Plaintiff is capable of performing sedentary work involving: occasional lifting and carrying of 20 pounds; frequent lifting and carrying of 10 pounds; standing and walking for 2 hours in an 8-hour workday; sitting for 6 hours in an 8-hour workday; occasional climbing of ramps, stairs, ladders, ropes and scaffolds; occasional stooping, kneeling, crouching and crawling; and pushing, pulling and balancing without limitation. (R. *Id.*).

Approximately two weeks later, on May 23, 2011, Dr. Lorenz agreed that Plaintiff could return to work. After noting that the FCE showed Plaintiff was capable of work at the light level, including occasionally lifting 40 pounds, Dr. Lorenz stated that Plaintiff was limited to "permanent light-duty," which he said consisted of occasionally lifting 40 pounds and sitting, standing and driving for a maximum of 3 to 4 hours per day. (R. 742). Dr. Lorenz gave Plaintiff a referral for vocational rehab in case he was not accepted back to his electrician job. (*Id.*). When Plaintiff saw Dr. Becker the next day, he was experiencing some withdrawal symptoms after being off all opioid medications for seven days. His pain was at a 5/10, with burning, soreness and spasms in his back and legs. Dr. Becker advised him to stay off the opioids and continue taking nortriptyline and Zanaflex. (R. 732).

Plaintiff returned to see Dr. Becker on June 21, 2011, reporting that his sleep had improved but he was still experiencing muscle spasms in his low back. He rated his pain at a 4/10 with muscle tightness over the lumbar spine. Plaintiff told Dr. Becker that he was exercising 15 to 20 minutes almost every day, but when pressed, he admitted that he was not doing his walking exercises. Dr. Becker told Plaintiff that his pain was most likely myofascial in nature, meaning it would not respond to opioid medication.

Instead, Plaintiff needed to increase the intensity of his exercises and "walk more with a purpose," which Dr. Becker felt should "significantly help with his current pain complaints." (R. 730). Dr. Becker increased Plaintiff's dosage of Klonopin (clonazepam) to help him sleep at night and instructed him to continue taking Zanaflex. He also considered starting Plaintiff on a Butrans patch. (*Id.*).

## 2. July 2011 through June 2012

On July 20, 2011 (the last day of the closed period of disability), Plaintiff returned for another reevaluation with Dr. Lorenz. He complained of some increasing thoracic pain at a level of 5/10 with intermittent tingling and numbness in his feet, and said he was occasionally using a cane to walk. His medications included Klonopin, Zanaflex and a Butrans patch. On examination, Plaintiff had pain with forward flexion through 40-45 degrees; pain on lumbar extension through about 5 degrees; and pain on lateral bending to about 10 degrees. A straight leg raise test was negative, however, and he had full strength of 5/5. Dr. Lorenz thought Plaintiff may be experiencing "hardware pain" and diagnosed chronic low back pain at L5-S1 and L4-5 spondylosis with facet arthrosis and ongoing back pain. He once again restricted Plaintiff to permanent light duty involving sitting, standing and driving for a maximum of 3 to 4 hours per day. Dr. Lorenz opined that Plaintiff had reached maximum medical improvement and noted that if the pain continued, he may need hardware removal, hardware injections, facet injections or fusion extension in the future. (R. 740).

Also on July 20, 2011, Dr. Lorenz completed a Musculoskeletal Defects or Fractures Report at the request of Plaintiff's attorneys to assist with his application for disability benefits. (R. 738-39). Citing the April 26, 2011 FCE conducted by the

physical therapist, Dr. Lorenz reiterated that Plaintiff was limited to permanent light duty work involving occasional lifting of up to 40 pounds and a maximum of 3 to 4 hours of sitting/standing/driving per day. Dr. Lorenz also confirmed that Plaintiff's condition was stable and permanent, with chronic low back pain at a level of 4-8/10. (R. 739).

A week later, on July 27, 2011, Plaintiff told Dr. Becker that he had stopped using the Butrans patch because it caused nausea and vomiting. Plaintiff complained of pain, which he described as tenderness, in the low back radiating into both legs at a level of 5/10, as well as middle back pain radiating up to his neck. (R. 776). He said he could not sit or stand for extended periods and pain prevented him from being more active during his day, though he was doing his daily exercises. Dr. Becker instructed Plaintiff to start taking Kadian and Lyrica again, and continue with the Zanaflex and Klonopin. (*Id*.). His discharge instructions indicated that Plaintiff had no restrictions in his activities. (R. 780).

On August 2, 2011, Dr. Lorenz completed a Disorders of the Spine Residual Capabilities Questionnaire at the request of Plaintiff's attorneys to assist with his application for disability benefits. (R. 794-95). Dr. Lorenz indicated that Plaintiff suffers from chronic and constant pain at a level of 4-8/10, along with bilateral radiculopathy. (R. 794). He has limited extension, flexion and rotation in the lumbosacral spine, and often has trouble concentrating due to pain and fatigue. (R. 794-95). In that regard, Dr. Lorenz noted that Plaintiff's medications cause drowsiness and impaired judgment. (R. 795). Once again, Dr. Lorenz limited Plaintiff to no more than about 3 to 4 hours per day of sitting/standing/driving. He also stated that he would expect Plaintiff to be absent from work more than three times a month. As a result, Dr. Lorenz concluded that

Plaintiff does not retain the functional capacity to work in a competitive environment, even at a sedentary level. (*Id.*).

Plaintiff saw Dr. Becker four more times between August 9 and December 27, 2011. At the August 9 visit, Plaintiff reported taking Kadian, Lyrica, clonazepam, Zanaflex and Phenergan. He said the medications made him sleepy but were not effective in relieving his low back pain, which radiated into both his legs and his upper spine. Dr. Becker once again declined to give Plaintiff opioids and told him he needed to increase the intensity of his exercise programs. (R. 787). He instructed Plaintiff to continue taking Kadian but taper off Zanaflex, (R. 792), and discharged him with no activity restrictions. (R. 791). Plaintiff's pain was still not adequately controlled at the September 12, 2011 visit, and he told Dr. Becker that despite exercising every day, he experienced pain mainly in the lower back radiating up the spine, with some pain radiating to his legs. Dr. Becker recommended that Plaintiff finish his current supply of Kadian and then switch to 20 mg of OxyContin three times a day. He was to continue taking clonazepam at night and also continue with PT. (R. 875).

On September 27, 2011, Lenore Gonzalez, M.D., affirmed Dr. Mitra's May 10, 2011 RFC assessment for sedentary work. (R. 90-93). At Plaintiff's next visit with Dr. Becker on October 12, 2011, he reported that his pain was at a level of 6/10, the OxyContin was not providing much relief, and he wanted to stop taking that medication. He also said that though clonazepam helped with sleep, he still slept poorly at least twice a week. Dr. Becker instructed Plaintiff to taper off the OxyContin and start Ultram (tramadol). (R. 882). On December 27, 2011, Dr. Becker noted that Plaintiff had stopped most of his pain medications in October except for clonazepam and Lyrica.

Plaintiff was also taking two tramadol a day and said that his pain was adequately controlled at a level of 5/10. Plaintiff told Dr. Becker that his sleep remained poor, but he was exercising a little more than he did in the past and "going to college to obtain a different degree." Dr. Becker made no adjustments to Plaintiff's medications and instructed him to follow up in two or three months. (R. 963).

The last available medical record is from six months later, on June 18, 2012, when Plaintiff saw PA Pittman from Dr. Lorenz's office. This was his first visit to that office in nearly a year, and approximately two months before the scheduled August 22, 2012 administrative hearing. PA Pittman noted that Plaintiff had been released to return to work as of July 20, 2011 but had not done so. Plaintiff's only medication at the time of this latest appointment was tramadol and he complained of back pain at a level of 7/10, as well as bilateral pain going down the back of both legs with burning in the front of both thighs. (R. 1054). Plaintiff said he could not sit for more than about an hour, he could tolerate standing for less than an hour, and he could walk for 30 to 40 minutes with a cane. On examination, Plaintiff was "slow going from sitting to standing"; his flexion was to about 30 degrees of motion; and he exhibited some irritation of the back on palpation. A straight leg raise test was negative, however, and he had full motor power of 5/5. PA Pittman ordered an MRI of the lumbar spine, instructed Plaintiff to remain off work and continue treating at the pain service, and referred him for facet injections at L4-5 and a lumbar hardware injection at L5-S1. (*Id.*). There is no evidence in the record that Plaintiff ever had the MRI or the recommended injections.

**B.      Administrative Law Judge's Decision**

The ALJ found that Plaintiff's lumbar back pain and status post lumbar back fusion surgery are severe impairments, but that they have never met or equaled any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 22-24, 28). For the period from May 7, 2010 through July 20, 2011, the ALJ determined that Plaintiff had the RFC to perform sedentary work with the following restrictions: he could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; never climb ladders, ropes or scaffolds; never work at unprotected heights or around dangerous moving machinery; and he had to be allowed to use a cane.  (R. 24).  In reaching this conclusion, the ALJ gave "considerable weight" to the opinions from Dr. Mitra and Dr. Gonzalez that Plaintiff was capable of sedentary work involving sitting for 6 hours and standing for 2 hours in an 8-hour workday.  (R. 26).  Given Plaintiff's pain medications, medication side effects, and "recovery from surgery with pain," however, the ALJ also determined that Plaintiff would have been off task for more than 10% of the workday throughout that period, which the VE testified would preclude all jobs.  (R. 24, 28).  Plaintiff was thus disabled from May 7, 2010 through July 20, 2011.  (R. 28).

Beginning on July 21, 2011, the ALJ found that Plaintiff experienced medical improvement because his pain was "better controlled and decreased."  In that regard, Plaintiff had reduced his Kadian (morphine) dosage by half as of April 2011, and by the time of the August 22, 2012 hearing, he testified that he was not taking any medications aside from tramadol.  (R. 28-29).  The ALJ determined that treatment notes from Dr. Lorenz and Dr. Becker indicated that Plaintiff's condition had stabilized, and found it significant that Plaintiff had returned to college in the fall of 2011 on a full-time basis and

was able to concentrate sufficiently to maintain a 4.0 grade point average. The ALJ also cited to treatment notes from Dr. Becker indicating that Plaintiff was able to walk without difficulty and had no restrictions in his activities. (R. 29) (citing R. 863-64, 867, 871-72, 885-86).

In light of this medical improvement, the ALJ modified Plaintiff's RFC as of July 21, 2011, finding that he still had the ability to perform sedentary work with the same postural limitations set forth prior to that date, but that he would no longer be off task for any part of the workday. (*Id.*). With this change, Plaintiff was no longer disabled based on the VE's testimony that a person with the same age, education, work experience and RFC would be able to work as a service scheduler (1,000 jobs regionally), repair order clerk (1,100 jobs regionally), or auto locator (800 jobs regionally). (R. 32-33).

In reaching this conclusion, the ALJ gave only some weight to Dr. Lorenz's opinion that Plaintiff cannot sit/stand/drive for more than 4 hours a day, finding it inconsistent with his own notes and the April 2011 FCE showing Plaintiff can perform light work with frequent sitting and standing. (R. 31). The ALJ instead assigned great weight to the ME's testimony that the overall objective evidence supports a finding that Plaintiff can work at the sedentary level. (R. 31-32). With respect to Plaintiff's testimony, the ALJ found his complaints of disabling pain after July 21, 2011 not fully credible given his ability to "ambulate without difficulty, exercise and go to school." (R. 30).

Based on all of these findings, the ALJ awarded Plaintiff benefits for the closed period from May 7, 2010 through July 20, 2011, but concluded that at all times

thereafter, he was no longer disabled within the meaning of the Social Security Act, and not entitled to further benefits.

**DISCUSSION**

**A.      Standard of Review**

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g).  In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations.  *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted).  Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations."  *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astru*e, 478 F.3d 836, 841 (7th Cir. 2007)).  The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled."  *Simila v. Astru*e, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).  Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required."  *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhar*t, 290 F.3d 936, 940 (7th Cir. 2002)).

**B.    Five-Step Inquiry**

To recover DIB or SSI under Titles II and XVI of the Social Security Act, a claimant must establish that he is disabled within the meaning of the Act.   *Keener v. Astrue*, No. 06-CV-0928-MJR, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008).[1]   A person is disabled if she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A); *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009).   In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work?   *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**C.    Analysis**

Plaintiff claims that the ALJ's decision must be reversed because she (1) erred in finding that his condition medically improved as of July 20, 2011; (2) made an improper credibility determination; and (3) improperly weighed the medical opinion from Dr. Lorenz.

---

[1]    The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq.*, and are virtually identical to the SSI regulations set forth at 20 C.F.R. § 416.901 *et seq.*

### 1.    Medical Improvement and Credibility

Plaintiff first argues that the record does not support the ALJ's finding that he experienced medical improvement as of July 21, 2011 and is now capable of performing sedentary work.   Medical improvement is defined as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled."   20 C.F.R. § 404.1594(b)(1).   A finding of decreased medical severity must be based on "changes in the symptoms, signs or test results associated with [the claimant's] impairment(s)."   *Id.*; *Tumminaro v. Astrue*, 671 F.3d 629, 633 (7th Cir. 2011).   When, as here, the ALJ finds the claimant disabled for a closed period in the same decision in which she finds medical improvement, the severity of the claimant's current medical condition is compared to the severity of the condition as of the disability onset date. *Koslow ex rel. Koslow v. Astrue*, No. 2:08-CV-159-PRC, 2009 WL 1457003, at *11 (N.D. Ind. May 22, 2009).

The ALJ found Plaintiff disabled from May 7, 2010 through July 20, 2011, explaining that though he was capable of performing sedentary work during that time, he would have been off task more than 10% of the day due to "pain medications, side effects from medications, [and] recovery from surgery with pain."  (R. 26-27).  The ALJ noted that physically, Plaintiff's condition improved following surgery, as evidenced by his full strength and negative straight leg raise tests in May and July 2011, but his use of a cane and ongoing need for significant pain medication "support[ed] work at the sedentary exertional level" with various postural limitations.  (R. 25).  This finding is consistent with the May 2011 opinion from Dr. Mitra that Plaintiff was able to perform

sedentary work, which the ALJ gave considerable weight. (R. 26). Nevertheless, Plaintiff's use of strong prescription medications, including Kadian, Norco, Lyrica, OxyContin, Percocet, Vicodin, Fentanyl and a morphine patch, prevented him from engaging in competitive employment due to "malaise, decreased concentration and memory." (R. 24).

For the period beginning July 21, 2011, the ALJ determined that Plaintiff was no longer disabled because he remained capable of the same sedentary RFC and would not be off task more than 10% of the day anymore. (R. 29). As the ALJ explained, Plaintiff substantially reduced his use of medication, indicating that his pain was "better controlled and decreased," and he returned to college full-time in the fall of 2011 "studying philosophy with a grade point average of 4.0," which "supports that [he] is capable of staying on task and has good concentration." (*Id.*).

There is no dispute that Plaintiff tapered off his opioid medications beginning in May 2011, and that by October 2011 he was taking only tramadol, Lyrica and clonazepam. (R. 29-30, 882, 963). His pain was "adequately controlled" with just tramadol in December 2011, he did not return to Dr. Becker for further medication management in 2012, and he was not taking any pain medication at all at the time of the August 2012 administrative hearing. (R. 30). At the same time, Plaintiff started attending college full-time in the fall of 2011, (R. 29), which he said entails "read[ing] a lot throughout the day," (R. 49), "writ[ing] a lot," and studying "a lot." (R. 48). He has maintained a perfect 4.0 G.P.A. and "plan[s] on taking it in to a career." (R. 29, 48). In addition, Plaintiff "work[s] with different community structures, like the community college near me, [to] try to organize forums or debates," co-chairs a committee on

intellectual development, and is a certified volunteer tutor for the Illinois I Read Program. (R. 24-25, 55-56). He also testified that without any pain medications, he is able to wash dishes as long as he alternates taking pressure off each foot, do some laundry, (R. 45), drive, (R. 43), go grocery shopping, (R. 54-55), and take care of his personal needs as long as he is cautious and slow. (R. 56). All of this evidence supports the ALJ's conclusion that after July 20, 2011, Plaintiff's pain improved and he is no longer unable to focus due to pain, pain medications, or any related side effects. (R. 29).

Plaintiff denies that his pain is better controlled, explaining that based on his consultations with Dr. Becker and a Dr. McManus (who he apparently saw for a second opinion), he decided to stop taking the medication not because his pain had decreased, but because "the consequences of long term pain medications outweighed the minimal pain relief they provided." (Doc. 13, at 12) (citing R. 46-47). He also insists that he "continued to suffer from [difficulty concentrating], just from increased pain, rather than the effects of pain medications." (*Id.* at 14-15). The ALJ reasonably concluded, however, that Plaintiff's claims in this regard were not fully credible. (R. 30, 32).

In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence. *See* SSR 96-7p, at *2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the

case record." *Arnold*, 473 F.3d at 822. *See also* 20 C.F.R. § 404.1529; *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004). Because hearing officers are in the best position to evaluate a witness's credibility, their assessment should be reversed only if "patently wrong." *Castile*, 617 F.3d at 929; *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

Plaintiff's allegations of disabling pain and difficulty concentrating are belied by his own report of adequate pain control in December 2011, as well as his ability to engage in thought-intensive studies throughout the day, maintain a 4.0 G.P.A., organize forums, volunteer, and care for his personal needs, all with minimal to no pain medication. *See, e.g., Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012) (plaintiff's complaints of disabling pain not credible where he "regularly completed his daily household activities without any pain medication – not even over-the-counter products."); *Pratt v. Colvin*, No. 12 C 8983, 2014 WL 1612857, at *11 (N.D. Ill. Apr. 16, 2014) ("The lack of prescription medication is inconsistent with a finding of disabling pain."). Plaintiff correctly notes that Dr. Lorenz opined in July and August 2011 that he suffers from chronic back pain and difficulty concentrating. (Doc. 13, at 14) (citing R. 795). Yet Dr. Lorenz never saw Plaintiff again after making that assessment (PA Pittman examined him in June 2012), so he was not aware that Plaintiff had achieved adequate pain control with tramadol in December 2011 and subsequently stopped all pain medications in August 2012. Nor did Dr. Lorenz know about Plaintiff's extensive studying activities beginning in the fall of 2011.

Plaintiff objects that the ALJ overstated the significance of his college work, stressing that he takes all of his courses online and "has the ability to take a break, shift

positions, or stop working all together until another time" if he is "experiencing extreme pain." (Doc. 13, at 14). For the reasons already stated, however, the ALJ fairly concluded that Plaintiff's ability to engage in extensive studying throughout the day and care for his personal needs with minimal to no medication undermines his allegations of extreme pain or related difficulties concentrating. As for Plaintiff's claimed need to constantly shift positions while he studies, this is contradicted by his own admission that he can walk comfortably for up to an hour and sit for about an hour at a time. (R. 44).

The Court also finds no merit to Plaintiff's assertion that the ALJ improperly equated his ability to perform activities of daily living with an ability to engage in full-time employment. (Doc. 13, at 14) (citing *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)) (criticizing this practice). In accordance with the regulations, the ALJ considered Plaintiff's activities as one factor in discounting his testimony and finding medical improvement. *See Tiemann v. Barnhart*, 152 Fed. Appx. 540 (7th Cir. 2005) ("When evaluating an applicant's allegations of pain, the ALJ must consider various factors, including daily activities."). The ALJ also cited other evidence, however, including the opinions from Dr. Mitra, Dr. Gonzalez and the ME that Plaintiff is capable of sedentary work; the April 2011 functional capacity evaluation showing Plaintiff can perform light work with frequent sitting and standing; and the reduction and ultimate discontinuation of all pain medication. (R. 26, 28-29, 31-32). In the absence of credible evidence that Plaintiff suffers from disabling pain and concentration deficits, the ALJ's decision to reject his testimony in that regard was not patently wrong. *See Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013) ("[T]he standard of review employed for credibility

determinations is extremely deferential," and an ALJ need only "provide some evidence supporting her determination.").

Plaintiff takes issue with three additional rationales the ALJ gave for finding medical improvement after July 20, 2011: his condition had stabilized; Dr. Becker's treatment notes showed that Plaintiff could "ambulate without difficulty and without restrictions in activities"; and he essentially stopped all treatment in 2012. (R. 29, 30). It is worth noting here that since the ALJ assessed Plaintiff with the same physical RFC for sedentary work both before and after July 21, 2011, it was not necessary for her to find medical improvement in these areas. In any event, Plaintiff concedes that both Dr. Becker and Dr. Lorenz described his condition as stable after July 2011 but claims stability is not the same as improvement. (Doc. 13, at 12). Though technically true, the stable nature of Plaintiff's condition does support the ALJ's finding that his physical RFC had not changed. Indeed, in September 2011, Dr. Gonzalez affirmed Dr. Mitra's May 2011 assessment that Plaintiff is capable of sedentary work, (R. 26, 70-72, 90-93), and the ME confirmed that evaluation in August 2012. (R. 32). Plaintiff does not claim that the ALJ made any error in assigning great weight to these opinions.

Plaintiff also objects that he is not in fact able to walk without difficulty or restrictions. The ALJ based this finding on Dr. Becker's treatment notes showing that Plaintiff was ambulating without difficulty and had no restrictions on walking on July 27, 2011, August 9, 2011, September 12, 2011, and October 12, 2011. (R. 29) (citing R. 752, 863-64, 867, 871-72, 885-86, 878-89). In light of these notes, as well as the FCE showing that Plaintiff was able to walk a mile with minimal pain elevation and exhibited "consistent posture, gait and movement patterns," (R. 748-49), and Plaintiff's own

testimony that he can walk comfortably for about an hour, (R. 44), combined with the fact that the ALJ restricted him to sedentary work involving mostly sitting with permission to use a cane, (R. 30), the Court finds nothing improper about this aspect of the ALJ's decision.

Plaintiff finally argues that his decision to stop seeing Dr. Lorenz (or anyone in his office) for nearly a year between July 20, 2011 and June 18, 2012 "says nothing of his level of functioning" because "[t]here was nothing more Dr. Lorenz could do for [him]" and he had reached maximum medical improvement. (Doc. 13, at 13). This is not entirely accurate. At the July 20, 2011 appointment, Dr. Lorenz told Plaintiff that if he continued to experience ongoing back pain, he could get facet injections, hardware injections, hardware removal, or a fusion extension. (R. 740). Plaintiff pursued none of these options despite significantly reducing and then stopping all pain medication. In fact, though PA Pittman referred Plaintiff for facet injections at the June 18, 2012 appointment, (R. 1054), there is no evidence in the record that he ever followed through with that treatment. Nor did he mention the referral at the hearing on August 22, 2012, or indicate that he planned to pursue injections in the future.

Viewing the record as a whole, substantial evidence supports the ALJ's finding that Plaintiff experienced medical improvement that enables him to perform sedentary work as of July 21, 2011.

### 2. Weight Given to Dr. Lorenz's Opinion

Plaintiff argues that the ALJ's decision must still be reversed because she did not afford sufficient weight to Dr. Lorenz's opinion that he (1) cannot sit, stand or drive for more than 4 hours per day; (2) would often have trouble concentrating due to pain,

fatigue and drowsiness; (3) would miss more than 3 days of work each month; and (4) cannot work in a competitive environment even at the sedentary level. (R. 738-39, 794-95). A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). An ALJ must offer "good reasons" for discounting a treating physician's opinion, Scott, 647 F.3d at 739, and then determine what weight to give it considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the attention of the ALJ. 20 C.F.R. § 404.1527(c)(2)-(5). *See, e.g., Simila*, 573 F.3d at 515.

In declining to give Dr. Lorenz's opinion great or controlling weight, the ALJ first found that it was not consistent with the April 26, 2011 functional capacity evaluation. (R. 31). Dr. Lorenz ordered the FCE on April 18, 2011 after releasing Plaintiff to what he called "light duty" work with a 15-pound lifting restriction. (R. 743). The FCE confirmed that Plaintiff was capable of "light" work but with a 40-pound lifting restriction and "frequent" standing and sitting. (R. 746). The physical therapist did not define the terms "light" or "frequent" but did note that Plaintiff was able to walk continuously for more than a mile at a speed of 2.5 mph with minimal pain elevation. (R. 748). On May 23, 2011, Dr. Lorenz relied on the FCE to support his finding that Plaintiff is restricted to

permanent light duty work lifting no more than 40 pounds.  He went further, however, and stated that Plaintiff cannot sit, stand or drive for more than 4 hours a day.  Though a physical exam that day showed stiffness on forward flexion, a straight leg raise was negative, strength was preserved at 5/5, and light touch was intact.  (R. 742).  Dr. Lorenz reiterated the same functional assessment in July and August 2011.  Plaintiff's physical exams on both dates continued to show full strength and negative straight leg raise tests though he did exhibit some pain on forward flexion, extension and lateral bending.  (R. 738-40, 794-96).

The ALJ reasonably concluded that Dr. Lorenz's opinion that Plaintiff cannot sit for more than 4 hours a day as required for sedentary work is inconsistent with the FCE for light work involving frequent sitting and standing.  The dictionary definition of "frequent" is "[o]ccurring or appearing quite often or at close intervals," (www.thefreedictionary.com/frequent, last visited June 3, 2015), and the Social Security regulations define frequent as up to two-thirds of the day.  SSR 83-10; *Houser v. Colvin*, No. 11-2272, 2013 WL 1667543, at *6 (C.D. Ill. Apr. 17, 2013).  Plaintiff claims that the term may have meant something different in the FCE context because "the maximum level of functioning is evaluated rather than what is sustainable, in full-time, competitive employment."  (Doc. 22, at 5).  Yet Dr. Lorenz wanted Plaintiff to have the FCE for the express purpose of assessing his ability to return to full-time, competitive employment.  Contrary to Plaintiff's suggestion, moreover, terms like "occasional" and "frequent" specifically contemplate the amount of time a person can engage in (i.e., *sustain*) a particular activity.  Since Dr. Lorenz based his functional assessment on the FCE, (R. 739, 795), and the FCE showed that Plaintiff is capable of full-time sedentary work with

frequent sitting, the ALJ did not err in finding an inconsistency between the FCE and Dr. Lorenz's opinion limiting Plaintiff to part-time work.

The ALJ also discounted Dr. Lorenz's opinion because it was not consistent with Plaintiff's "good reports after surgery, recovery, reduced pain medications, [and] ability to ambulate." (R. 31). As explained in the previous section, the ALJ reasonably found that Plaintiff's ability to attend college full-time, maintain a 4.0 G.P.A., "read a lot throughout the day," "write a lot," study "a lot," organize forums, co-chair a committee on intellectual development, and work as a certified volunteer tutor, all with minimal to no pain medications, demonstrates that he can stay on task and maintain good concentration sufficient to engage in full-time sedentary employment. (R. 29, 48-49, 55-56). Once again, this finding is supported by the opinions from Dr. Mitra, Dr. Gonzalez and the ME, as well as repeated notes from Dr. Becker showing Plaintiff had no difficulty or restrictions with respect to ambulation. Notably, as discussed earlier, Dr. Lorenz had no knowledge of Plaintiff's activities at the time he gave his opinion because Plaintiff did not start them until the fall of 2011. He was also unaware that Plaintiff had achieved adequate control of his pain in December 2011, and stopped taking all medications in 2012.

On the record presented, the ALJ did not err in assigning little weight to Dr. Lorenz's opinion, and built a logical bridge between the evidence and that conclusion.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment (Doc. 20) is granted, and Plaintiff's Motion for Summary Judgment is denied. The Clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: June 10, 2015

SHEILA FINNEGAN
United States Magistrate Judge